**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **NAJMAH RASHAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-863 (RMC)** |
| | ) | |
| **WASHINGTON METROPOLITAN** | ) | |
| **AREA TRANSIT AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**OPINION**

Najmah Rashad, a legal secretary at the Washington Metropolitan Area Transit

Authority, requested accommodation to attend religious services on Friday afternoons.

WMATA initially offered Ms. Rashad different accommodations than she requested, but it was

ultimately able to accommodate her fully.  Although it agreed to Ms. Rashad's final proposal,

WMATA stated more than once that the accommodation was granted despite being a burden on

the Office of General Counsel and contrary to normal policy.  Ms. Rashad filed a charge of

discrimination and retaliation because of this message.  She filed this lawsuit in June 2012, after

completing the administrative process.  In August 2012, WMATA terminated Ms. Rashad, and

she added a claim of retaliatory discharge to her complaint.

WMATA has moved to dismiss, arguing that Ms. Rashad failed to state a claim in

either count of her amended complaint.  After her time for filing a second charge passed,

WMATA filed a supplemental motion to dismiss, arguing that Ms. Rashad had failed to exhaust

her administrative remedies before filing suit on Count II.  Both parties have added exhibits to

their briefs in addition to those mentioned in the Amended Complaint and, at oral argument, had

1

no genuine dispute as to the relevant facts but disputed their legal significance.  The Court will accordingly treat the motion as one for summary judgment.  *See* Fed. R. Civ. P. 12(d).

## I. FACTS

Najmah Rashad is a resident of Maryland and a citizen of the United States.  From January 2008 until August 2012, Ms. Rashad worked as a legal secretary in WMATA's Office of the General Counsel (OGC).[1]   Ms. Rashad is of the Muslim faith.  In December 2010, Ms. Rashad began working an Alternative Work Schedule (AWS), which gave her one day off every two weeks.  She was assigned an AWS day off on alternate Tuesdays.

Wanting to attend the Muslim Jummah Prayer Service[2] every Friday, on December 30, 2010, Ms. Rashad asked that her AWS day be changed from Tuesdays to Fridays. Susan Serrian, Manager of Legal Administrative Services, OGC, denied this request on January 12, 2011.   *See* Def. Mot. [Dkt. 12], Ex. 1 [Dkt. 12-3] (1/12/11 Email from Serrian to Rashad). Ms. Serrian explained OGC's policy that limited the number of administrative employees allowed off on any given day in order to assure coverage to the Office attorneys.  She further explained that Fridays were already assigned to other members of the administrative staff and therefore no additional person could take Friday as an AWS day without compromising the work of the Office, which was understaffed.  She also noted that two members of the administrative staff were experiencing medical problems which required recurrent absences, making it even more difficult to ensure secretarial coverage.  Ms. Serrian reminded Ms. Rashad of Ms. Serrian's recent memo to all staff about the difficulties of coverage under the circumstances and

---

[1] The Office of General Counsel is referred to as "COUN" by the parties.

[2] Jummah is a Muslim congregational prayer observed every Friday just after noon.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987) ("Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer." (citing Koran 62:9-10)).  The parties spell Jummah in various ways, and the Court uses the spelling supplied by Ms. Rashad.

"indicating AWS privileges may be suspended in the near future for a period of time due to these medical situations."  *Id.*  In the alternative, Ms. Serrian offered to permit Ms. Rashad to use annual leave if she needed a longer-than-scheduled lunch hour to attend Friday Jummah services and suggested that she could ask a colleague to switch AWS days.  She also advised that Ms. Rashad could make a formal Request for Religious Accommodation under WMATA policy.  *Id.*

Ms. Rashad adopted the last piece of advice and filed a Request for Religious Accommodation, asking for a permanent accommodation for "Jummah attendance on Fridays beginning Friday January 28, 2011.  7:00 am start time.  Leave at 12:30.  Use my personal leave."  Def. Mot., Ex. 2 [Dkt. 12-4] (Request for Religious Accommodation).  Asked by Ms. Serrian for clarification, Ms. Rashad explained, "I am requesting to change my work hours on Friday to a start time of 7:00 a.m. and a departure time of 12:30 p.m., utilizing annual leave for the rest of the day."  Def. Mot., Ex. 3 [Dkt. 12-5] (1/21/11 Email from Rashad to Serrian).  Thereafter, a lengthy memo from OGC to the WMATA Religious Accommodation Panel explained:

> Ms. Rashad is requesting that she be allowed to utilize annual leave every Friday from 12:30 p.m. to the end of her work day so that she can attend the Jumu'ah congregational prayer. . . .
>
> Ms. Rashad is a Legal Secretary and has been employed in COUN since January 27, 2008.  She is responsible for providing litigation and other legal support to 5 COUN attorneys.  COUN has four legal secretaries to support 22 attorneys.  Currently, one of the secretaries is suffering from a serious medical condition which requires him to be absent 3-5 days per pay period, essentially making him a part-time employee. . . . In addition, COUN's Office Manager is also on extended sick leave which is scheduled to last between 8 weeks and five months . . . .  Making the situation more complicated is the fact that Ms. Rashad supports all three of COUN's workers' compensation attorneys [who] . . . typically handle a combined caseload of 300+ cases. . . . Ms. Rashad is also responsible for supporting a civil litigation attorney and a general law attorney.
>
> . . .

3

> In her request for religious accommodation, Ms. Rashad indicates that she is willing to arrive at 7:00 a.m., leave at 12:30 p.m., and take "personal" leave every Friday so that she can attend Jumu'ah.  COUN has serious doubts that Ms. Rashad will arrive at 7:00 a.m. and also questions her ability to accrue the annual leave necessary [] for her every Friday absence.  Within her first year of employment, Ms. Rashad established a pattern of taking unscheduled leave and regularly arriving late to work.  This pattern has continued throughout . . . [She has been counseled and suspended from her prior AWS schedule as a result. And when she asked to begin work at 7:00 a.m., she was consistently late.] Given her past record of late arrivals, it is not reasonable to believe that Ms. Rashad can consistently arrive for work at 7:00 a.m. or that she can accrue the necessary annual leave to cover her proposed Friday absences.

Def. Mot., Ex. 5 [Dkt. 12-7] (1/25/11 Memo from COUN to WMATA Religious

Accommodation Panel (misdated 2010)).

By letter dated March 14, 2011, the Religious Accommodation Panel denied Ms.

Rashad's specific request because of its impact on OGC's business operations and suggested

alternatives.  *See* Def. Mot., Ex. 6 [Dkt. 12-8] (3/14/11 Letter from Quillen to Rashad).  Pursuant

to WMATA policy, the Panel had first invited Ms. Rashad to meet with the Panel to discuss her

specific request, provide additional information, and discuss whether other accommodations

were feasible.  However, Ms. Rashad had arrived with legal counsel and "declined to attend the

meeting unless he was also allowed to participate."  *Id.* at 1.  The Panel had explained to Ms.

Rashad and her lawyer that it offered "an internal, interactive and non-adversarial process, and

third parties are not allowed to participate."  *Id.* at 1-2.  In lieu of Ms. Rashad's in-person

discussion with the Panel, the Panel offered to submit written questions "to allow [Ms. Rashad]

to clarify [her] request and in a further attempt to better understand the nature and scope of [her]

request."  *Id.*  Ms. Rashad agreed to this course of action.  The Panel explained to Ms. Rashad, in

the presence of her attorney, that the Panel was seeking her "personal responses."  *Id.* at 2.

Instead, however, Ms. Rashad's counsel sent the Panel an email that was "both substantively and

4

procedurally unacceptable" and replete with legal argument. *Id.* at 2.  On March 4, 2011, the

Panel forwarded its questions directly to Ms. Rashad and set a deadline for response.  *Id.*  Her

response was four days late and did not answer the questions but did offer two variations on her

requested accommodation: to use leave without pay ("LWOP"), not personal leave, to cover

Friday absences; or to come in earlier and/or work later.  After considering these proposals, the

Panel determined that:

> [T]he requested accommodation would constitute an undue hardship for
> [WMATA] to the extent that it would create a shortage among qualified
> staff employees within the Office of General Counsel each Friday
> afternoon and would therefore require [WMATA] to incur more than *de
> minimus* costs.  This is the case regardless of whether [Ms. Rashad]
> attempted to cover the absences by working additional hours outside of
> [her] regular shift (on Friday and/or on other days of the week), by using
> annual leave, or by some combination of these two approaches.

*Id.*  The Panel offered two alternatives.  First, it suggested that Ms. Rashad use up to two hours

of annual leave each Friday, from 1:30 to 3:30 p.m., in addition to her lunch hour starting at

12:30, to attend Jummah prayers.  Second, it suggested that she might report one half-hour early,

at 8:00 a.m. each Friday, take leave from 12:30 to 3:30, and return to work until 5:30 p.m., one

half-hour later than normal, which would reduce the amount of annual leave needed to cover her

time off.  Finally, the Panel advised that Ms. Rashad could appeal to, or file a complaint of

religious discrimination with, the Director of the Office of Civil Rights.  *Id.*

Before Ms. Rashad filed an appeal or complaint, OGC hired an additional legal

secretary.  On March 18, 2011, Ms. Serrian informed Ms. Rashad of the new hire and told her

that AWS leave would be reinstated—it had been suspended due to understaffing—effective

April 11, 2011.  As a result, Ms. Serrian advised that

> COUN will approve an AWS schedule which allows you to take
> the first Friday of each pay period off so that you can attend Jumu
> 'ah.  On alternative Fridays, you will be allowed to leave at 12:30,

> as per your prior request, and utilize appropriate leave for the period of time between the end of your lunch hour and the end of your schedule for the day.

Def. Mot., Ex. 7 [Dkt. 12-9] (3/18/11 Email from Serrian to Rashad).  Ms. Serrian also warned Ms. Rashad that her future time and attendance must be consistent with WMATA policies.  Ms. Serrian's email was sent at 5:26 p.m.  *Id.*  Ms. Rashad submitted her appeal by email to the Office of Civil Rights (identified as "CIVR" by the parties) at 5:45 p.m. on the same date.  *See* Def. Mot., Ex. 8 [Dkt. 12-10] (4/22/11 Letter from Wynne to Rashad).

Ms. Rashad met with James T. Wynne, Jr., Director of WMATA's Office of Civil Rights, on April 19, 2011.  She frankly acknowledged during that meeting, as she does before this Court, that she had received the accommodation she had requested.  *Id.* at 1 ("During our meeting I asked if you currently have the religious accommodation that you requested.  You answered that you do.").[3]  Nonetheless, Ms. Rashad "voiced a concern regarding having to use [her] vacation time instead of being allowed to use leave without pay," saying she could not locate any policy addressing the issue.  *Id.*  Mr. Wynne said he would "check into this matter." *Id.*  After their meeting, he verified WMATA policies in its Personnel Policies and Procedures Manual, sent a copy of the relevant policy to Ms. Rashad, and told her that she "must first use the accumulated leave before you can be granted the leave without pay."  *Id.* at 2.  Since she had

---

[3]   Counsel for Ms. Rashad made this point particularly clear at oral argument.  The transcript reveals the following colloquy:

> COURT:  The issue is no longer one of accommodation.  The issue is only the warning and the discharge?

> PLAINTIFF's COUNSEL:  Correct.

Tr. of Oral Arg. ("Tr.") 20:12-14.

received the requested accommodation, Mr. Wynne also told Ms. Rashad that he considered the matter closed. *Id.*

Ms. Rashad left a voicemail for her supervisor sometime on or shortly before Thursday, April 28, 2011, indicating that she had "some business" to take care of and would not be at work on that date.  Pl. Opp'n [Dkt. 13-1], Ex. A (5/3/11 Memo from Serrian to Rashad). Because Ms. Rashad had given no prior notice or received prior approval for her absence from work, and did not have enough personal leave to cover the time off, Ms. Serrian formally warned Ms. Rashad that her absence would be treated as Absence Without Leave (AWOL).[4]  *Id.*  In the same memorandum, Ms. Serrian also informed Ms. Rashad that "COUN has granted your religious accommodation request and is allowing you to leave work every Friday at 12:30 to attend Jummah.  The General Counsel agreed to approve Leave Without Pay (LWOP) for these Friday absences, but as you have been told, you must use whatever annual leave you have available before LWOP will be granted."  *Id.*  Ms. Serrian also advised that her memo constituted a written warning and that further instances of AWOL could result in discipline or termination.  *Id.*

On May 4, 2011, Ms. Rashad responded that leaving work every Friday at 12:30 to attend Jummah "will not work for me, for it will place me in a position of having to exhaust all of my vacation and sick leave in order to be accommodated religiously."  Def. Mot., Ex. 10 [Dkt. 12-12] (5/4/11 Email from Rashad to Serrian).  She said she would submit yet a different proposed accommodation to her supervisor, by which she could work 75 hours every two weeks in order to leave every Friday at 12:30 p.m. and still accumulate personal leave.  *Id.*

---

[4] Ms. Rashad does not contest these facts, just as neither party contests any of the documents attached to their briefs.  Most of these documents are referenced in the Amended Complaint.

The next day, May 5, 2011, Ms. Rashad signed a formal Alternative Work Schedule Agreement with WMATA, effective May 9, 2011.  The final AWS provided that Ms. Rashad would report to work at 8 a.m. every Monday [one-half hour early] and work an 8 hour day until 5 p.m.; report to work at 7:30 a.m. every Tuesday-Thursday [one hour early] and work an 8.5 hour day until 5:00 p.m.; and then report to work at 8:30 a.m. [normal time] every Friday and work a 4 hour day until her lunch break at 12:30, at which time she would leave work.  Def. Mot., Ex. 9 [Dkt. 12-11] (5/5/11 AWS Agreement).  This schedule constituted 37.5 work hours each week, which is a normal workweek for OGC staff.  *Id.*  Notably, this schedule permitted Ms. Rashad to split her AWS "day" into two half-days.  Ms. Serrian approved this AWS request on May 11, 2011, in an email that also noted that the schedule "conflicts with WMATA's AWS policy and may impose a burden on the office," and reminded Ms. Rashad that she "must maintain a record of reliable attendance and punctuality in order to participate in the AWS program."  Def. Mot., Ex. 10 [Dkt. 12-12] (5/11/11 Email from Serrian to Rashad).  Count I of the Amended Complaint is directed to the May 3, 2011 AWOL warning and other communications from WMATA, which Ms. Rashad alleges discriminated against her and retaliated against her by telling her that she could be disciplined and/or fired for not working all hours and that her accommodation was a "burden."[5]  She filed her charge on July 21, 2011.  Am. Compl. ¶ 4.

One year later, on June 1, 2012, Ms. Rashad stopped coming to work altogether. *See* Def. Mot., Ex. 11 [Dkt. 12-13] (8/7/12 Letter from O'Keeffe to Rashad).  As detailed in

---

[5] As filed, Ms. Rashad's Complaint alleged that WMATA committed "wrongful acts" when it required Ms. Rashad to exhaust her personal leave before WMATA would extend LWOP. Compl. [Dkt. 1] ¶¶ 18-19; *see also* Am. Compl. [Dkt. 7] ¶ 23.  This theory of violation has been abandoned.  Ms. Rashad now combines the May 3, 2011 AWOL warning with statements by WMATA that her accommodation could impose a burden on OGC as the basis for her claim of religious discrimination in Count I.  *See* Opp'n at 3.

WMATA's termination letter of August 17, 2012, whose facts are not disputed by Ms. Rashad, she failed to provide requested medical records or medical authorization for her lengthy absence and failed to appear at a scheduled independent medical examination.  Def. Mot., Ex. 12 [Dkt. 12-14] (8/17/12 Termination Letter).  To the contrary, Ms. Rashad specifically told WMATA on July 28, 2012, that she was *not* seeking coverage for her absence under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, which requires an employee's cooperation in demonstrating a family or medical issue for covered leave, *see* 29 C.F.R. § 825.303. Termination Letter at 1.  Thereafter, when OGC received a letter on August 14, 2012, from Ms. Rashad's physician indicating that she suffered from a Panic Disorder and recommending that she be transferred out of OGC to another WMATA department, Ms. Serrian immediately asked Ms. Rashad to submit a written "Request for Job Accommodation/Modification" to invoke WMATA's process under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, for reasonable accommodation.  Termination Letter at 1-2.  Ms. Rashad did not respond although she acknowledged receipt of the email.  Termination Letter at 2.  Concluding that Ms. Rashad had declined to participate in the processes or to provide supporting documentation to demonstrate rights under either the FMLA or ADA, and that she had therefore been AWOL since July 3, 2012, the Termination Letter informed her that she had abandoned her position and her employment was terminated, effective August 17, 2012.  *Id.*

Ms. Rashad first filed a complaint in federal court on June 4, 2012, *see* Dkt. 1. That Complaint claimed religious discrimination and retaliation.[6]  *See* Compl. ¶¶ 15, 17, 18.  Ms.

---

[6] The complaint alleges that WMATA's actions in failing to accommodate her and retaliating against her violate the settlement agreement in *United States v. WMATA*, Case No. 08-1661. *United States v. WMATA* challenged WMATA's refusal to accommodate the religious beliefs that prevented bus operators from wearing the mandated bus uniform.  By its terms, the

Rashad filed an Amended Complaint on September 10, 2012, *see* Dkt. 7.  The Amended Complaint slightly revised the same allegations in Count I, *see* Am. Compl. ¶¶ 20, 22, & 23, and added Count II, claiming retaliatory discharge.  *Id.* ¶ 33 (alleging "the decision to terminate plaintiff was based upon her religion (Muslim) and was done in direct reprisal for engaging in protected activity").  WMATA filed a Motion to Dismiss the Amended Complaint on October 22, 2012, *see* Dkt. 12, which Ms. Rashad opposed, *see* Dkt. 13.  WMATA filed a Supplemental Motion to Dismiss on April 2, 2013, *see* Dkt. 15, arguing that the statute of limitations had expired on Ms. Rashad's retaliatory discharge claim in February 2012 and she had filed no charge with the EEOC, making its supplemental motion ripe.  Ms. Rashad has opposed the supplemental motion as well, *see* Dkt. 17.

The Court heard oral argument on WMATA's motion on April 25, 2013.  In the course of that argument, some of Ms. Rashad's theories of violation became crystallized and some were dropped.  *See, e.g.*, Tr. at 20:12-14 (clarifying that Ms. Rashad's claims do not concern a failure to accommodate but instead focus on the AWOL warning and her discharge).

Finally, while both parties rely heavily on documents referenced in the Amended Complaint, each has added exhibits to its briefs.  The Court therefore treats the motion as one for summary judgment.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  While the parties argued the legal significance of the relevant facts, there is no genuine dispute of material fact between them.[7]

---

settlement expired in 2011.  The record here demonstrates WMATA's adherence to the procedures required by the settlement.  In other respects, it is irrelevant to Ms. Rashad's claims.

[7] Ms. Rashad has argued against summary judgment because she asserts that she presents a prima facie case and deserves discovery.  *See* Opp'n at 1 ("The issue is not whether the plaintiff will

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255; Talavera, 638 F.3d at 308.  A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. Anderson, 477 U.S. at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its

---

ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims.").  Ms. Rashad contends that she was disciplined for seeking an accommodation and "disputes that she abandoned her job but [claims that] in any event, the allegations in the Amended Complaint are treated as true" on a motion to dismiss. Id. at 2, 5.  While she contends that discovery would allow her to develop a record of "other unjustified disciplinary actions," id. at 3-4, she offers no specifics.  Most importantly, Ms. Rashad no longer contests the facts that she took a day off without prior approval and with insufficient leave and that she absented herself from work from June 1 to mid-August 2012 without medical support or participation in WMATA processes under FMLA or ADA.  Her arguments do not preclude summary judgment because both parties have had the opportunity in briefing and at oral argument "to present all the material that is pertinent to the motion," Fed. R. Civ. P. 12(d), and there is no dispute as to the underlying facts.  Additionally, Ms. Rashad's motion to amend her complaint, relief requested in her opposition, is denied for these same reasons.

favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary

judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

Ms. Rashad is of the Muslim faith and wished to absent herself from work every

Friday afternoon to attend Jummah congregational prayer.  She asked for an accommodation for

her religious beliefs and received it, despite its burden on OGC and inconsistency with WMATA

policies.  Ms. Rashad alleges that WMATA discriminated and retaliated against her for asking

for a religious accommodation and when it fired her over one year later.   As this suit has

progressed, Ms. Rashad's theories of liability have shifted.  The Court will address them all in an

abundance of caution.[8]

### A.  Count I

In Count I, Ms. Rashad alleges religious discrimination and retaliation under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Title VII prohibits discrimination

in employment on the basis of religion.  The statute defines religion to include "all aspects of

religious observance and practice, as well as belief, unless an employer demonstrates that he is

unable to reasonably accommodate an employee's or prospective employee's religious

observance or practice without undue hardship on the conduct of the employer's business."  42

U.S.C. § 2000e(j).  It is "an unlawful employment practice . . . for an employer not to make

reasonable accommodations, short of undue hardship, for the religious practices of his employees

and prospective employees."  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

Plaintiffs claiming religious discrimination under § 2000e(j) must first make a prima facie

---

[8] Jurisdiction and venue as to Ms. Rashad's claims are proper in this Court.  *See* 42 U.S.C.
§ 2000e–5(f)(3) ("Each United States district court . . . shall have jurisdiction of actions brought
under this subchapter. Such an action may be brought in any judicial district in the State in which
the unlawful employment practice is alleged to have been committed . . . .").

showing that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 95 (D.D.C. 2006) (internal quotation marks and citations omitted); *see also Baker v. The Home Depot*, 445 F.3d 541, 546 (2d. Cir. 2006) (stating the requirements for a claim of religious discrimination under § 2000e(j)). If a plaintiff establishes a prima facie case, the employer must show that it was unable to accommodate the plaintiff's religious needs reasonably and without undue hardship. *Lemmons*, 431 F. Supp. 2d at 95. There is no dispute that Ms. Rashad held a bona fide religious belief that conflicted with the employment requirement of working on Friday afternoons and that she informed WMATA of her belief. The parties disagree over the third element of the prima facie case—whether Ms. Rashad was disciplined for failure to comply with the conflicting employment requirement.

In addition to claiming religious discrimination, Ms. Rashad alleges that WMATA retaliated against her for seeking religious accommodation. Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee because she has "opposed" a practice proscribed by Title VII or because "[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). To make out a retaliation claim, a plaintiff must show "(1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). Materially adverse actions are not limited "to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). However, a plaintiff must

show that the employer's actions "would have been materially adverse to a reasonable employee." *Id.* at 71.  Further, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57.

When an employer offers a "legitimate, non-discriminatory reason" for its allegedly materially adverse action, "the sole remaining question" becomes "retaliation *vel non*—whether, based on all the evidence, a reasonable jury could conclude that [the] proffered reason . . . was pretext for retaliation." [9]  *Pardo–Kronemann v. Donovan*, 601 F.3d 599, 603–04 (D.C. Cir. 2010) (internal quotation marks and citations omitted); *see also McGrath*, 666 F.3d at 1380 n.3 ("[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." (internal quotation marks and citations omitted)).  A plaintiff can show pretext "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

The documents cited in the Amended Complaint evidence Ms. Rashad's various requests for accommodation and WMATA's efforts to design something reasonable for its workplace.  First, Ms. Rashad asked to change her AWS day from Tuesdays to Fridays, but WMATA explained that other OGC employees took Fridays as AWS days and her request conflicted with AWS policies and would burden OGC.  In the alternative, WMATA suggested that Ms. Rashad use annual leave to extend her lunch hour or ask a colleague to switch days off with her.  Second, Ms. Rashad filed a formal Request for Religious Accommodation, asking to

---

[9] The same kind of analysis can also apply to claims of religious discrimination.

start her work days early every Friday and to use personal leave to cover her absences on Friday afternoons without returning to work.  Third, Ms. Rashad refused to meet with the Religious Accommodation Panel or, initially, to answer its written questions without legal representation; in this process, she changed her request and asked to be granted LWOP on Friday afternoons, so that she would not exhaust her personal leave, or to be allowed to work earlier and later on other days to cover Friday afternoon absences.

The Panel concluded that these requests would impose an undue hardship on OGC and denied them.  It offered the alternatives of taking three hours at lunchtime, using personal leave for two hours after her lunch hour, or reporting earlier and leaving later on Friday, which would require use of only one hour of personal leave (assuming an absence of three hours for Jummah attendance).  WMATA then hired an additional legal secretary and restored AWS, which had been suspended.  WMATA agreed that Ms. Rashad could work an alternative schedule with every other Friday as her AWS day off and that she could use appropriate leave, first exhausting her personal leave before LWOP, for non-AWS Fridays to attend Jummah congregational prayers.

Fourth, Ms. Rashad appealed the grant of her requested accommodation because she could not find a basis in WMATA policies for requiring her to use up her own personal leave before LWOP.  However, because this approach was fully consistent with WMATA policies sent to her and she acknowledged that she had been granted her requested accommodation, her appeal was closed.  Fifth, Ms. Rashad proposed that she work a variable schedule which would split her AWS "day" in half, allow her to work longer hours on some days, take every Friday afternoon off completely, and still not rely on her own vacation time to cover her absences.  OGC approved

this final proposal, noting that it conflicted with the AWS policy and could burden the office and reminding Ms. Rashad of her obligation to work the hours set out in her AWS schedule.

Ms. Rashad does not challenge any of these facts.  The law requires an employer to reasonably accommodate an employee's religion if it can do so without undue hardship.  *See* 42 U.S.C. § 2000e(j); *Trans World Airlines*, 432 U.S. at 74.  It is clear that WMATA engaged in an extensive interactive process to accommodate Ms. Rashad's requests and ultimately gave her the precise accommodation she sought.  In fact, Ms. Rashad's counsel made clear at oral argument that she does not contend that WMATA failed in this obligation.  *See* Tr. at 30:1-4 (acknowledging that WMATA fully granted Ms. Rashad's accommodation).  When faced with Ms. Rashad's request for every Friday afternoon off without returning to work, WMATA had to consider the challenges facing OGC—understaffing, sick and absent colleagues, and the demands of the litigation attorneys for whom Ms. Rashad worked.  Within these constraining circumstances, WMATA offered various accommodations.  When circumstances changed and WMATA offered the accommodation Ms. Rashad had originally requested—Friday afternoons off work with reliance on her own accrued personal time to cover her absences— she realized the consequences of using her own personal leave to attend Jummah and pursued her amended request that she be granted LWOP for her Friday afternoon absences.  Still, despite its inconsistency with WMATA AWS policy and Ms. Rashad's past difficulty with reporting to work on time and unannounced absences, WMATA ultimately agreed to her final proposal that she work a variable schedule and "split" her AWS day off into half-days.

Accordingly, the question raised by Count I is not one of accommodation but instead whether WMATA discriminated or retaliated against Ms. Rashad when it informed her in writing that her absence without leave on April 28, 2011, "results in loss of pay for the absence

and can result in further disciplinary action" and that "[d]espite the burden on the office in

general and your attorneys in particular, COUN has granted your religious accommodation

request and is allowing you to leave work every Friday at 12:30 to attend Jummah" with

appropriate leave.  5/3/11 Memo from Serrian to Rashad ("AWOL warning"); *see also* 5/11/11

Email from Serrian to Rashad ("Although the AWS schedule you have proposed, 3.5 hours off

each Friday [with variable hours], conflicts with WMATA's AWS policy and may impose a

burden on the office, your attorneys and your colleagues due to staffing shortages, it is

acceptable to COUN with regard to your request for religious accommodation.").  Ms. Rashad

admits that the AWOL warning was not based on her attendance at Friday prayers but argues that

it was a disciplinary action and an adverse action that imposed tangible harm by discouraging her

from attending Friday prayers.  *See* Opp'n at 3.  Ms. Rashad claims that the warning and

statements that her accommodation constituted a "burden" on the OGC made her feel retaliated

against.  *See* Am. Compl. ¶ 22; Tr. at 35:1-3.  None of these arguments has legal merit.

     To begin with, Ms. Rashad's complaint about the reference to "burden" in the

AWOL warning and other communications from WMATA—used to express the impact of her

absences on OGC—misapprehends the law.  As stated above, an employer's obligation to

accommodate an employee's religious observances extends *only* to the point that no "undue

hardship" on its work results.  42 U.S.C. § 2000e(j); *see also Ansonia Bd. of Educ. v. Philbrook*,

479 U.S. 60, 69 (1986) (employer satisfies Title VII "when it demonstrates it has offered

reasonable accommodation to the employee" and need not offer every possible accommodation).

WMATA's messages informed Ms. Rashad that her absences constituted a burden but that it was

willing and able to accommodate her religious practices despite the burden.  WMATA was well

within its rights to consider any burden imposed by an accommodation request and whether the

burden rose to the level of an undue hardship. *See EEOC v. Rent-A-Center, Inc.*, No. 11-1170, 2013 WL 208948, *4-*6 (D.D.C. Jan. 18, 2013) (concluding that the employer had demonstrated undue hardship); *Rasch v. Nat'l R.R. Passenger Corp.*, No. 90-0913, 1991 WL 221270, *5-*6 (D.D.C. Oct. 11, 1991) (unpublished) (granting summary judgment because "it would have been impossible for Amtrak to accommodate [plaintiff's] religious needs without incurring undue hardship"). Its reference to a "burden" in communications with Ms. Rashad, therefore, does not support her claims of discrimination and retaliation.

Additionally, the AWOL warning arose from Ms. Rashad's admitted failure to show up for work without prior approval. Ms. Rashad no longer disputes that she was absent from work without permission or an adequate leave balance on April 28, 2011 before she received the AWOL warning.[10] Insofar as the warning addressed these undisputed facts, it cannot be attributed to her request for a religious accommodation, her desire to attend Friday Jummah prayers, or her religion. The Court thus finds that the AWOL warning was unrelated to Ms. Rashad's request for an accommodation for religious observances and that her admitted absence dooms an argument that she was "disciplined for failure to comply with the conflicting employment requirement," as necessary to make out a claim of religious discrimination. *See Lemmons*, 431 F. Supp. 2d at 95. Notably, Ms. Rashad's religious accommodation involved a request to absent herself from work on Friday afternoons to attend Jummah and the AWOL warning involved her failure to appear for work without permission on April 28, 2011, a Thursday.

---

[10] Ms. Rashad's previous statement that she had "sufficient leave" for her April 28, 2011 absence has been withdrawn. *See* Am. Compl. ¶ 23. Her counsel now argues that she had only "a little bit of leave." Tr. at 24:2. Since Ms. Rashad admittedly had insufficient leave to cover a full-day absence, which she took without prior notice or approval, the AWOL warning was neither discriminatory nor retaliatory.

The AWOL warning also fails to meet the legal standard for a materially adverse action in the context of a retaliation claim. *See McGrath*, 666 F.3d at 1380 (stating requirement for a "materially adverse action"). The D.C. Circuit has held that a letter of reprimand that "contained no abusive language, but rather job-related constructive criticism" did not constitute a materially adverse action. *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); *see also Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75 (D.D.C. 2011) (concluding that a letter of reprimand "with minimal explication" and "lack[ing] any abusive language" did not constitute a materially adverse action). The AWOL warning here merely informed Ms. Rashad that her absence would be recorded as "without leave" and that additional instances of AWOL could result in disciplinary action. At oral argument, Ms. Rashad's counsel complained that Ms. Rashad had to "fight" for months to achieve an acceptable accommodation and then received a memo that retaliated against her for even asking. *See* Tr. at 24:20-25:1 (Plaintiff's Counsel: "My client was basically fighting to get the opportunity to take Fridays off so she can attend Friday prayers. . . . So the reason [the warning] is retaliatory is because after she has just gone about fighting to get this alternative work schedule and this Friday off, she gets hit with this written warning."). The Court cannot agree. *Id.* 25:6-10 (Court: "The problem with the logic is that she was actually absent for a day. I mean she wasn't warned out of the clear blue sky. She actually just called one day and said I can't be there. I have personal business and didn't come to work and didn't have enough leave to cover that."). No reasonable employee would be dissuaded from exercising protected rights when receiving a warning that addressed only the employee's unapproved absence for personal business—and further stated that her request for religious accommodation had been granted. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57

19

("[E]mployer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.").

Because Ms. Rashad has failed to plead a prima facie case for religious discrimination or retaliation based on the May 3, 2011 AWOL warning and statements that her accommodation would be a "burden" to OGC, summary judgment will be entered for WMATA on Count I.

### B. Count II

Count II complains that WMATA retaliated against Ms. Rashad because of her protected activity by terminating her employment on August 17, 2012. WMATA argues that Count II should be dismissed for failure to exhaust administrative remedies. The Court agrees.

A Title VII claimant must exhaust her administrative remedies before bringing her claim to court. *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *see also Bowers v. Dist. of Columbia,* No. 10-2056, 2011 WL 2160945, at *4 (D.D.C. June 2, 2011) (dismissing a Title VII claim for failure to exhaust). To exhaust her administrative remedies, a complainant must first file a charge with the Equal Employment Opportunity Commission ("EEOC") "within one hundred and eighty days after the alleged unlawful employment practice occurred" or "within three hundred days after the alleged unlawful employment practice occurred" if the employee first initiated proceedings with a "State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e)(1). Additionally, the claimant's charge "must be pending before the agency or the EEOC for at least 180 days, or plaintiff must be notified by the EEOC of his or her right to sue through the issuance of a right-to-sue letter, and bring suit within ninety days." *Greggs v. Autism Speaks, Inc.*, No. 12-1107, 2013 WL 1297223, *3 (D.D.C. March 20, 2013) (citing, *inter alia*, 42 U.S.C. §2000e-5(f)(1)); *see also Hunter v. District of Columbia*, No. 09-1491, 2012 WL 5974036, *4 (D.D.C. Nov. 29, 2012).

"Historically, a lawsuit based on an EEOC charge generally could include 'claims that [were] like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Hazel v. WMATA*, No. 02-1375, 2006 WL 3623693, at *7 (D.D.C. Dec. 4, 2006) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (alteration in original)). *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), however, changed that generous assumption. *Morgan* specified that an EEO charge "must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred," and all discrete discriminatory acts that occurred *prior to* this statutory time period were "untimely filed and no longer actionable." *Id.* at 113-14. *Morgan* specifically noted that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114.

District judges in this Circuit have not agreed on the implications of *Morgan* — specifically on the extent to which *Morgan* requires exhaustion of claims based on discrete discriminatory acts that occurred *after* the filing of an EEO charge.[11] Most judges in this district have held that plaintiffs alleging discrete acts of discrimination or retaliation "must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others." *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137-38 (D.D.C. 2004) (PLF); *see also Hunter v. District of Columbia*, 797 F. Supp. 2d 86, 95 (D.D.C. 2011)

---

[11] The D.C. Circuit has identified the divide in authority on this issue but has yet to adopt a position. *See Payne*, 619 F.3d at 65 (stating that "[w]e need not decide whether *Morgan* did in fact overtake that line of cases," referring to those "cases that permit[] federal employees to litigate unfiled claims that are 'like or reasonably related to' claims they did file with their agencies"); *see also Weber v. Battista*, 494 F.3d 179, 183-84 (D.C. Cir. 2007) (recognizing contrasting positions taken by federal courts of appeal and concluding that "we need not adopt either of the foregoing views in order to conclude . . . that [plaintiff] exhausted her administrative remedies").

(ABJ) (following the "[c]ourts in this district [that] have applied *Morgan* in holding that a plaintiff must exhaust his administrative remedies with respect to distinct acts that occurred after the filing of an administrative charge"); *Taylor v. Mabus*, 685 F. Supp. 2d 94, 99 (D.D.C. 2010) (JR) (suggesting in dicta that exhaustion is required for discrete acts of discrimination and retaliation even if such acts are reasonably related to prior exhausted claims); *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (RCL) ("Although *Morgan* bars recovery for, on its facts, discrete acts occurring before the statutory time period, *Morgan* has, on the whole, been understood to also bar discrete acts occurring after the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court.").  Other judges do not read *Morgan* to disallow unexhausted claims arising after the filing of a charge: "'where the subsequent retaliatory acts [are] of a like kind to the retaliatory acts alleged in the EEOC charge, [and are] specified to be of an ongoing and continuing nature[,]' separate administrative exhaustion is not required."  *Hazel*, 2006 WL 3623693, at *7 (RWR) (quoting *Wedow v. City of Kansas City*, 442 F.3d 661, 674 (8th Cir. 2006)); *see also in Lewis v. District of Columbia*, 535 F. Supp. 2d 1, 8 (D.D.C. 2008) (RMU) (applying a narrow reading of *Morgan*, "consistent with this Circuit's post-*Morgan* jurisprudence").

This Court is of the opinion that discrete acts of discrimination and retaliation require discrete charges and an opportunity for investigation before litigation.  *See Morgan*, 536 U.S. at 114 (identifying "[d]iscrete acts such as termination" as requiring a separate EEO charge).  However, the question is not dispositive here.  Ms. Rashad failed to exhaust her administrative remedies, both (1) because her discharge was a discrete act for which she failed to file any EEO charge *and* (2) because it was not "of a like kind to the retaliatory acts alleged in

the [first] EEOC charge" and was not "of an ongoing and continuing nature." *Hazel*, 2006 WL

3623693, at *7.  Ms. Rashad does not qualify for any narrow reading of *Morgan* because, as

*Payne* explained,

> [F]or a charge to be regarded as "reasonably related" to a filed
> charge under that doctrine, it must at a minimum arise from the
> administrative investigation that can reasonably be expected to
> follow the charge of discrimination.  This connection is necessary
> to give the agency an opportunity to resolve the claim
> administratively before the employee files her complaint in district
> court.

619 F.3d at 65 (internal quotation marks and citations omitted).  *Payne* reasoned that plaintiff's

claim of retaliatory conduct in January 2008 could not possibly have arisen from the

administrative investigation of her 2004 EEO charges because the administrative investigation of

those charges ended in September 2007.  *Id.*  Similarly, Ms. Rashad filed this lawsuit in June

2012, after the EEO investigation was ended by her request for a Right To Sue Letter in January

2012, and she was terminated on August 17, 2012.  *See* Def. Supp. Mot. [Dkt. 15], Ex. 2 [Dkt.

15-2] (1/6/12 Letter from Rashad to EEOC Investigator Douglas).  Indeed, there was no

possibility that the EEOC could have investigated her discharge claim while investigating her

first claim.  The events complained of took place on May 3, 2011 and August 17, 2012 and were

unrelated in time.

        The Court further notes that the only connection between the AWOL warning on

May 3, 2011, and the discharge on August 17, 2012, is that each was provoked by Ms. Rashad's

acknowledged failure to come to work to perform her job, despite an absence of leave,

permission, or legal coverage.  Her protected activity—whether seeking a religious

accommodation, filing a charge, or filing a lawsuit—did not insulate her from the common,

everyday requirement to show up for work.  *See* Tr. at 26:3-5 (Court: But you don't deny the fact

that she did not come to work? Counsel: I can't deny that no.")

The Court concludes that Ms. Rashad failed to exhaust her administrative

remedies as to her discharge.  Further, because more than 180 days have passed since her

termination, her claim has now become time-barred.  *See* 42 U.S.C. § 2000e-5(e)(1); *Whorton v.*

*WMATA*, No. 11-1291, 2013 WL 633046, *7 n.8 (D.D.C. Feb. 21, 2013) (concluding that the

180 day provision of § 2000e-5(e)(1) controls in cases concerning WMATA, which enjoys

sovereign immunity).  Summary judgment on Count II will be entered for WMATA.[12]

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant summary judgment to WMATA.

A memorializing Order accompanies this Opinion.


DATE: May 23, 2013

                              _____/s/_____
                              ROSEMARY M. COLLYER
                              United States District Judge

---

[12] Count II also fails on the merits.  The connection between Ms. Rashad's June complaint and August termination is insufficient, in the face of admitted evidence of her lengthy absence without excuse, legal right, or employer authorization, to save her job.  WMATA had a legitimate non-discriminatory reason for Ms. Rashad's discharge and Ms. Rashad has failed to offer any evidence which shows that this reason was mere pretext for a retaliatory purpose.